**ROBERT O., Respondent Below, Appellant,**

v.

**ECMEL A., Petitioner Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 14, 1983.

Decided: April 25, 1983.

Mark H. Froehlich (argued) and Louis B. Ferrara, Wilmington, for appellant.

Vivian A. Houghton, Boudart & Houghton, Wilmington, for appellee.

Before HERRMANN, Chief Justice, HORSEY and MOORE, Justices.

MOORE, Justice:

Upon the petition of the wife, charging her former husband with exerting undue influence, the Family Court rescinded a separation agreement made in 1978. *Ecmel A. v. Robert O.,* Del.Fam., 451 A.2d 1170 (1982). The husband appeals, contending that the wife failed to prove that the agreement was executed because of undue influence exerted by him. He also argues that she did not present sufficient evidence of disparity in the values of the marital assets divided between them which is necessary to show unfairness or inequity. We reject both of these claims since the evidence in the record supports the findings of the Family Court judge. In addition, the husband raises the equitable defense of laches against the wife's challenge to the agreement. We conclude, however, that he has not established the elements of this defense. Therefore, we affirm.

I.

The parties were married in February 1968, following the husband's visit to Turkey, where he met his wife, a Turkish native. They moved to Delaware the next month, and lived together in Delaware until their divorce in February 1978. Three children were born of the marriage: Joseph, born in 1969, and twins, Michael and Christopher, born in 1973. The wife, with her husband's approval, stayed at home to raise the children. She was not fluent in English, but based on her experience as a key punch operator in Turkey, she was able with figures and assumed management of the family's finances.

In December 1977, the husband told her that he wanted a divorce and refused to consider reconciliation. He consulted an attorney for advice on an agreement to govern property division and custody of the children. There was conflicting testimony about the discussions the parties had over the terms of the agreement, but the trial judge found that the husband had "told [the wife], 'what I wanted in the agreement' and 'what I was going to give her', with a warning that if she refused to go along with his demands, he was 'going to court to get it' ". *Ecmel A. v. Robert O.,* Del.Fam., 451 A.2d 1170, 1171 (1982). He demanded her interest in their house and custody of the oldest son, Joseph. It is undisputed that the husband advised her to obtain a lawyer if she desired. However, she was unaware of her rights under Delaware family law and felt powerless, due to her immigration status, to object to her husband's demands. This feeling of helplessness was underscored by her financial dependence on him, thus limiting her ability, as she saw it, to retain an attorney. Furthermore, "he threatened [that] if she did not cooperate with him, he would 'make it worse for her'. She interpreted this admonition as meaning that he would seek to have the custody of their twins taken from her": 451 A.2d at 1171–72.

The husband's attorney prepared an agreement embodying his client's demands,

and it was executed in January 1978, as was the deed transferring the wife's interest in the house to the husband. Under the terms of this "bargain", she could remain in the house until June of that year; he would pay the plane fare to Turkey for her and the twins; and each of them would be responsible for his or her own debts after June 1. The agreement contained a number of "mutual 'boilerplate' covenants" but was "silent with respect to matters normally set forth in agreements of this sort, such as provisions for the support of [the wife and the twins], for the payment of marital debts incurred during the marriage, or for the division of all personal property acquired during their marriage". 451 A.2d at 1172.

Following the divorce in February 1978, the wife and twins stayed in the marital home until May. They left for Turkey that month, taking clothing, little (if any) cash, and a very limited amount of personal property, such as a few pots and pans. The husband kept the remainder of the property acquired during the marriage, including most of the household furnishings, both cars, and the bank accounts. Though not required under the separation agreement, he paid all of the marital debts, including those that the wife incurred in preparing to return to Turkey.

Because of difficulties in adjusting to their new home, the wife and twins returned to Delaware several months later. Following her application for public assistance, state authorities initiated child support proceedings against the husband. An attorney of the Bureau of Child Support Enforcement told her in January 1980 that recission of the separation agreement could be obtained, but she took no action to do so until October 1981. This, in the words of the Family Court judge, was "due to her fear of repercussions from [the husband]". 451 A.2d at 1173.

## II.

### A.

According to the husband, the wife had to establish by clear and convincing evidence that she signed the separation agreement because of his alleged undue influence. He contends that she did not meet this burden and suggests that she sought recission merely because the agreement turned out to be a bad bargain. Relying on a presumption of undue influence that arises from the confidential relationship of husband and wife, the wife responds that the evidence supports a conclusion that undue influence was exerted.

Though the presence of undue influence depends on the facts of any given case, it consists of four elements: 1) a person who is subject to influence; 2) an opportunity to exert undue influence; 3) a disposition to exert such influence; and 4) a result indicating the presence of undue influence. *See Conner v. Brown,* Del.Supr., 3 A.2d 64, 71 (1938); *G.A.S. v. S.I.S.,* Del. Fam., 407 A.2d 253, 258 (1978). If no confidential or fiduciary relationship exists between the parties, there is no presumption that anyone exerted undue influence in the particular transaction. 25 Am.Jur.2d *Duress & Undue Influence* § 43, at 403 (1966). Thus, the burden of proving undue influence falls upon the party who asserts it.

A different approach is taken if the parties stand in a confidential or fiduciary relationship. In that situation, "equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites". *Peyton v. William C. Peyton Corp.,* Del.Supr., 7 A.2d 737, 747 (1939). This presumption is triggered by the marital relationship, which Delaware law views as being a confidential one involving trust concepts. *Id.; G.A.S.,* 407 A.2d at 258; *Adams v. Jankouskas,* Del. Supr., 452 A.2d 148, 152 (1982). It follows that the Family Court judge applied well-settled Delaware law when he placed the burden upon the husband of proving that the separation agreement was fair and equitable.

The wife's testimony, which was subject to extensive cross-examination, was the only evidence of the circumstances that led to the separation agreement. Based on her statements, the trial judge found the husband to be the dominant party when the agreement was signed, and implicitly concluded that the first three elements of undue influence were present. *See also G.A.S.,* 407 A.2d at 258. The Family Court's findings are supported by more than sufficient evidence, including the statements made during the parties' discussions about the agreement, the wife's ignorance of her legal rights, the similarity between the ultimate agreement and the husband's initial demands, the absence of independent counsel or advice to the wife, the previous affection and trust between the parties, and the wife's fear of losing custody of the twins. The husband argues that he informed the wife that she could consult an attorney, and that she was able to read the agreement at her leisure at home. Those facts were weighed by the trial judge, but he thought them to be of little significance, and by themselves, they are not conclusive. *See also* Annot., 123 A.L.R. 1505, 1515–17 (1939).

*Wife (J.F.V.) v. Husband (O.W.V., Jr.,),* Del.Supr., 402 A.2d 1202, 1204 (1979) sets forth the scope of review on an appeal from the Family Court, and that controls the result with respect to the husband's first argument. The findings of the trial judge are amply supported by the record. Moreover, his determination of facts is based on his estimate of the wife's credibility and the acceptance or rejection of her "live" testimony. His findings are the obvious product of an orderly and logical deductive process, and we conclude that they are not clearly erroneous. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

### B.

In determining the fairness of the agreement, the trial judge examined it in terms of the wife's "material interests". *Ecmel A. v. Robert O.,* Del.Fam., 451 A.2d 1170, 1173–74 (1982). The husband, challenging the scope of that inquiry, contends that the wife's interests were returning to Turkey to seek employment and taking what property she could manage in light of shipping restrictions. Thus, he argues, the agreement was fair because he paid the plane fare to Turkey for her and the twins.

The husband's proposed analysis is myopic at best. To construe one's material interest, solely in the context of the rights or interests secured by the agreement, neglects consideration of the means by which the agreement was obtained. Stating the logical extension of husband's argument shows its absurdity. A spouse's material interests in this situation must be viewed in light of the substantive rights given by Delaware's family law. These include alimony, child custody, child support, property division, and attorney's fees. *See G.A.S. v. S.I.S.,* Del.Fam., 407 A.2d 253, 259 (1978). It follows that there was no error in the trial judge's observations regarding the agreement's silence on these issues.

### C.

The value of the marital property, almost all of which the husband retained under the separation agreement, was established by the wife's testimony. For some items she gave an approximate purchase price, and an extensive list reciting the cost of other household furnishings and goods was received into evidence. The value of the house was the subject of much debate between counsel, there being some question about the outstanding balance of the mortgage and any other liens. The trial judge, using an appraiser's estimate, concluded that the house had a market value of $28,-100 in January 1978 with a mortgage which had then been reduced to $13,500. Evidence also was admitted as to various debts, which the husband assumed independently of the separation agreement.

The husband now argues that the wife inadequately proved the value of this property, thus failing to show that the agreement was unfair or inequitable. Certainly, this aspect of the case could have been better presented. However, the wife

only had to establish the worth of these goods by a preponderance of the evidence. Fam.Ct.R. 220(d). Moreover, her testimony as to their value was initially admissible and proper. Under Delaware law, one is always permitted to express an opinion as to the value of one's own assets. *See State v. 0.15 Acres of Land,* Del.Supr., 169 A.2d 256 (1961). The husband presented nothing to the contrary, apparently relying on cross-examination of the wife to create doubt and confusion on this subject. Though her testimony was rambling and indicated uncertainty or lack of knowledge about the cost of some items, or the amounts of some debts, any discrepancies are not substantial. The trial judge had the advantage of observing and hearing the wife before making his findings. We entertain no doubt that his conclusions about the value of the property and debts, and by extension, the unfairness of the agreement, fully meet the tests of judicial review established by *Wife (J.F.V.) v. Husband (O.W.V., Jr.,),* Del. Supr., 402 A.2d 1202 (1979).[1]

### III.

The wife testified that an attorney in the Bureau of Child Support Enforcement advised her in January 1980 that the separation agreement could probably be rescinded. However, she took no formal action to do so until October 1981 when the petition for recission was filed in Family Court. According to the wife, this delay was due in part to attending school, attempting to find a job, working in various part-time jobs, and caring for the twins. Furthermore, she believed that she could not afford to retain an attorney to pursue the matter. The only apparent material change in these circumstances that led her to initiate legal action was counsel's acceptance of the case in June or July 1981 without payment of a retainer or fee.

On the basis of this evidence, the husband argued at trial that the wife had unreasonably delayed in seeking relief, thus raising the equitable defense of laches. To show that the delay resulted in prejudice to him, he introduced proof of improvements and repairs to the house.[2] The trial judge, apparently without comment, rejected the defense.[3] In his final argument on appeal, the husband reiterates the position he took at trial. The wife responds that the husband did not suffer any prejudice because of the delay, thereby failing to establish an essential element of the defense.

The defense of laches depends on more than the issue of unreasonable delay in the assertion of one's rights. It is

> principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the property or the parties. Where no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed, the delay is not fatal.

2 Pomeroy's Equity Jurisprudence § 419d, at 177–78 (5th ed. 1941). *See, e.g., Turek v. Tull,* Del.Ch., 139 A.2d 368, 373, *aff'd,* Del. Supr., 147 A.2d 658 (1958); *Bay Newfoundland Co. v. Wilson & Co.,* Del.Ch., 4 A.2d 668, 673 (1939). Substantial improvements to property may constitute sufficient prejudice to support a finding of laches. *See Motta v. Gouveia,* R.I.Supr., 122 A.2d 159 (1956). We do not doubt that the installa-

---

1. As the Family Court judge recognized, a separation agreement is often made during a period in which the parties are under emotional stress and subject to manipulative tactics. When one party was not represented by counsel, the trial court was properly alert to possible undue influence which had the effect of subverting the intent of our family law. *See Bruce E.M. v. Dorothea A.M.,* Del.Supr., 455 A.2d 866, 873 n. 10 (1983).

2. A new furnace was installed in September 1979 at the cost of $975. Thermopane windows were purchased for over $1,300 in May 1981. The record also contains an estimate for repair and replacement work to the kitchen, but there is no evidence that the work was done. In addition, there is proof of minimal purchases of wood or paneling.

3. The judge found that the delay was "due to her fear of repercussions from [the husband]". *Ecmel A. v. Robert O.,* Del.Fam., 451 A.2d 1170, 1173 (1982).

tion of a furnace and special storm windows are significant changes. But implicit in the concept of laches is the requirement that there be a causal relationship between the delay and the alleged prejudice. *See Millard v. Taylor,* Del.Ch., 247 A.2d 436, 437 (1968); *Fitzgerald v. O'Connell,* R.I.Supr., 386 A.2d 1384, 1388 (1978); 2 Pomeroy's, *supra,* at 177–79. There is no indication that the husband relied on the parties' marital status or the existence of the separation agreement when deciding to make the particular purchases that appear on this record. There being no prejudice to the husband, the defense is unavailing.[4]

\* \* \*

AFFIRMED.

---

4. Since we have concluded that the husband suffered no prejudice, we do not reach his claim that the wife unreasonably delayed in bringing this action. *See Millard,* 247 A.2d at 437.